IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

M.M., by his natural guardian and next
friend, Kathy Moore,

    Plaintiff,

vs.

    Case No. 07-2291-JTM

Unified School District No. 368,
Miami County, State of Kansas,

    Defendant.

MEMORANDUM AND ORDER

This is an action under the Individuals with Disabilities Education Act (IDEA), based on the assignment of the plaintiff M.M. to attendance at Prairie View High School in Prairie View, Kansas. The plaintiff also brings claims under the Rehabilitation Act and the Americans with Disabilities Act. The defendant Unified School District Number 368 has moved for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Plaintiff M.M. is an eighteen year-old child of Kathy and Wesley Moore. He was 17 years-old at the filing of this action. He lives in Paola, Kansas with his mother.

M.M. has Downs Syndrome. His abilities include:

- Operates a computer, mouse, keyboard; internet, save files, delete files, and send and receive e-mail.
- Reads the newspaper and books on wrestling and boxing.
- Keeps up with current events in the Middle East.
- Has taken guitar lessons and plays tambourine, maracas, and drums.
- Mows the lawn and operates a weed-eater without supervision.
- Is independent with respect to meals, eating, grooming, and hygiene.
- Active in Boy Scouts and has achieved the rank two below Eagle, which he has accomplished with only reasonable accommodation of verbally giving required reports.
- Has attained the rank of "blue belt"" in karate class, participating with non-disabled peers without the need for accommodation.
- Has high personal expectations to attend college, be a firefighter, get married, live on his own.

M.M. began the 2007-2008 school year as a Junior in high school.

Defendant USD 368 is a school district in Kansas. It provides special education and related services to students with IEPs by contract with the East Central Kansas Special Education Cooperative (ECKSEC). ECKSEC was created, by contract, to provide services to USD 368 and several other school districts, and is not a separate legal entity from USD 368.  ECKSEC does not have its own employees and buildings; it provides special education and related services to students using employees and facilities of USD 368 and other school districts. It provides special education to the students in eight school districts, located in Miami, Linn, Franklin, and Anderson Counties, and in 43 school buildings although not all services are provided in each district or building

The delivery of special education services through a cooperative program among multiple school districts such as ECKSEC is an accepted method in the State of Kansas and other states, because it is an economically feasible way to deliver mandated services to special education students in certain communities.

The Level program serves children from kindergarten through graduation.  It is designed for students who benefit more from a functional educational approach than a strictly academic one. Level programs are administered through ECKSEC and building administrators. Each student's IEP team determines eligibility. Level programs are divided into four, age-specific levels, each offered at a different location in the district:

| Level I | K - 2nd grades | Cottonwood Elementary School |
| Level II | 3rd - 5th grades | Sunflower Elementary School |
| Level III | 6th - 8th grades | Paola Middle School |
| Level IV | 9th - 12th grades | Prairie View High School. |

Prairie View High School is located in La Cygne, Kansas, and is the only high school in the eight school districts that has the Level IV Level Program.

The use of a "cluster" or "Level" system is an accepted method of delivering special education services in Kansas. The benefit of providing services in this format lies in the efficiency and effectiveness of such delivery system, which permits the District to also provide "wrap around" services such as nursing, OT/PT, adaptive physical education, speech and language. The system is an accepted method of delivering needed support and services, including special education services, to enable a student to be successful and to meet that students needs. In doing so, there is no assumption that a general education environment is the appropriate service delivery method and may often lead to a more restrictive environment because of the need for adult supervision.

The plaintiff seeks to controvert this fact by asserting that elsewhere in Kansas, children with learning disabilities successfully participate in general education classes. However, the cited evidence merely shows that an alternative exists and is used in Kansas schools. It does not controvert the evidence provided by defendant that the "cluster" or "Level" system is an accepted method of delivering special education services for Kansas students.

Prairie View High School has a blend of traditional and special education students. It serves the communities of La Cygne, Parker, and Fontana. It has an enrollment of approximately 330 students. Like Paola High School, Prairie View has classrooms, a lunch room, gymnasium, and library, all of which are open to all students of the school and provide M.M. an opportunity to integrate with the traditional age peer students. It is a traditional high school in every sense and just happens to host the Level IV program. The Level IV program is an integral part of Prairie View High School and, therefore, it encourages M.M. to interact with and be a part of the traditional students at the School. His classes include one regular education class, Introduction to Agriculture.

At Prairie View High School, special education services specified in each student's IEP are provided. General education class participation is decided on an individual basis based on ability. Special education services, other than the Level Program services, are available to students in all of the schools in the eight school districts, although not all services are available in all schools.

4

M.M. attended elementary and junior high schools operated by USD 368 in Paola, Kansas. While there, M.M. took part in general education classes, and was provided special education services in the same building. He was placed in the Level Program in junior high school.

On July 11 and 12, 2002, a Due Process hearing was conducted regarding an IEP for M.M. On September 16, 2002, the Hearing Officer issued his decision which resulted in a determination in favor of USD 368. On November 12, 2002, a Reviewing Officer sustained the Hearing Officer's Decision. M.M.'s parents then filed suit against the USD 368 and requested a review of that decision by the Miami County, Kansas District Court.

On March 10, 2004, the parents and the District entered into an agreement which placed M.M. in the Paola Middle School Level III program. The plaintiff attempts to controvert this fact by arguing that the agreement may have resulted in such a placement, but the language of the agreement itself specifies that M.M. would be placed in a specific course, rather than generally providing that the placement was with the Level program. However, the plaintiff stipulated in the Pretrial Order that the parents and the District "entered into an agreement on March 10, 2004 which placed MM in the Paola Middle School Level III program." (Pretrial Order, at ¶ 4(a)(14)).

Pursuant to the mediated agreement, a new Comprehensive Evaluation was administered and completed on September 8, 2004. The same year, Larry Ward, Ph.D., School Psychologist tested M.M. His scores on the Wechsler Intelligence Scale for Children were verbal comprehension, 47; perceptual reasoning, 51; working memory, 50; processing speed, 50. M.M.'s grade equivalency was: overall academic achievement 1.8, reading, 2.1; math 1.3; written language 1.9; full scale 1.8 which would place M.M. as a typical first grade student.

Although the parties agreed in the mediation to an attempt to develop a new IEP subsequent to the Comprehensive Evaluation, they didn not complete a signed, agreed-to IEP during the 8th or 9th grades. As a result, M.M. remained in the Level Program due to a stay-put clause in the mediated agreement. The plaintiff attempts to controvert this fact, by arguing that the agreement itself contained no stay-put determination, and that the previous determination was modified on a

temporary basis only. The court finds that the requested fact, that M.M. was in the Level program and that this was due the effect of the 2004 agreement and the earlier stay-put clause, is uncontroverted because it is based on plaintiff's specific and positive assertion in response to Defendant's Request for Admissions (Def. Exh J. at 11) that "M.M. remained in the Level Program because of the Stay Put clause."

On September 22, 2004, the IEP Team met M.M.'s parents to discuss the process of transition from Level III to Level IV. M.M.'s parents did not sign the proposed IEP and wanted to review it before signing. (See Pretrial Stip. ¶ 4(a)(17)). Cynthia Goering, Principal of Paola Middle School, suggested to M.M.'s mother that she should take it upon herself to visit Prairie View High School in La Cygne, Kansas. M.M. was in the Level III Program by agreement and the Level IV Program would be at Prairie View where Ms. Goering anticipated M.M. would attend. The parties needed to address the issues of the transition.

When M.M. first attended the Paola Middle School there was some discussion that he needed to be placed on a behavior plan. At a prior placement meeting, an organization called Project STAY came to the school and suggested a behavior plan, but the staff at Paola Middle School did not observe conduct warranting such a plan. The staff saw behaviors which included fidgeting and lack of focus while in regular education classes, believed these behaviors resulted from being inappropriately placed in these classes. When placed in the Level Program, M.M.'s behaviors improved. He seemed much more on task, ready to work, less fidgety. Project STAY observed M.M. in the spring of 2004, noting a favorable impression of M.M.'s classroom conduct. The observers indicated that they were not seeing the same inappropriate behaviors they had seen earlier.

Plaintiff attempts to deny the fact that he ever engaged in disruptive behavior, but the only evidence cited shows only that his mother never received any formal reports of disruptive behavior sufficient to justify suspending M.M. from school. The evidence that staff saw fidgeting and a lack of focus while M.M. attended general education classes is uncontroverted.

The Hearing Officer found that M.M. was uncomfortable in regular education as evidenced by his behavior which improved when placed in the Level III Program. The staff was trying to accommodate M.M.'s educational needs, but the things being taught M.M. were unrecognizable to the regular curriculum. It became such that the staff could no longer modify the regular education satisfactorily without rendering it unrecognizable for M.M. himself.

After being placed in the Level III Program, M.M. displayed a greater comfort level and began making academic progress and was learning at his level.

M.M.'s 8th grade class schedule was:

> Level III: Math, Communications/English, Seminar and parts of Kansas History, Seminar and Science.
>
> Regular Education: Parts of Kansas History, Science, P.E., and Related Arts-Computer, Tech Lab, Art and Music.

On April 26, 2005, a Notice of Proposed IEP Meeting scheduled for May 11, 2005, was sent to M.M.'s mother.

The May 11, 2005 IEP meeting was short. The IEP Team, both parents, and the parent's attorney attending the meeting, over which Principal Goering presided. An IEP for summer school 2005 was approved. The Director of Special Education, Dr. Hughes, explained the Cooperative Level Program. Cheryl Kratzberg described the Level IV Program at Prairie View High School, and Principal Goering reviewed a proposed IEP for M.M.'s ninth grade school year. M.M. would be attending Prairie View High School, the site of the Level IV Program. There was no other discussion regarding present levels of educational performance, IEP goals or benchmarks, supplemental aids or services, or accommodations or modifications or access for M.M. to regular high school programs. Principal Goering did not see a necessity to have a prolonged meeting that was going to produce no positive results. The meeting was adjourned. The parent's attorney stated that they would discuss options and contact the District prior to May 25, 2005. This did not occur.

On August 18, 2005, Rod Allen, a School District representative sent M.M.'s mother a letter confirming that M.M. had been assigned to and would attend the Level IV Program at Prairie View

High School.  The decision was based on the nature and extent of M.M.'s disability, his IQ designation, his functional behavior, his age and significance of disability, and the IEP Team's honest beliefthat Level Program would provide the best educational benefit for M.M.

M.M.'s Level IV class schedule for high school for Ninth Grade was Job Skills, Art 1, Document Processing, Essential Math, English 9, Life Skills and Science 9.  For Tenth Grade, M.M.'s classes would include English 10, Technology, PE, and Biology. Additionally, M.M. would take  Introduction to Agriculture and Job Skills.

M.M.'s daily schedule, after dressing and preparing for school, includes being picked up by the bus at 6:55 AM and arriving at the school in La Cygne approximately an hour to an hour and a half later. School begins at 8:25 AM. While the distance is not that great from Paola to La Cygne, because the bus picks up four additional students that live considerable distance from each other, the trip is about 50 miles each way. M.M. is the first picked up and the last dropped off. School ends at 3:00 PM and M.M. generally arrives home between 4:15 and 4:30 PM.

In September 2005, Kathie S. Nichols, Ph.D., tested M.M. on the Wechsler Intelligence Scale for Children and determined that M.M. had a cognitive disability and was an average boy with Down Syndrome, which she categorized as "mild mental retardation." Nichols also assessed M.M.'s overall communication skills as low for his age.  She recommended that M.M. remain at Paola High School.  By transferring M.M. to a different school, Ms. Nichols opined that a new environment and unfamiliar situations could be a set back for M.M.

For the 2005-2006 school year, two days of each week, M.M. was in work-study at Price Chopper Grocery in Paola. He was, however, bussed to Prairie View High School at the usual time, attendance was taken and lunches were prepared and then was taken by bus back to Paola for work-study about 9:30 AM. The two days he was in work-study he missed Introduction to Agriculture, his regular education class.  His mother removed him from the work-study program due to the lengthy commute.

8

On May 18, 2006, an IEP Team met to determine the appropriate educational services for M.M. Health, Art and Level IV teachers, a Transitional Advisor, a School Psychologist, a Speech Language Pathologist, an Occupational Therapist, a School Nurse, an Assistant Principal, M.M. and his father attended. Those attending agreed at the meeting that the Level IV Program was an appropriate placement for M.M.'s education needs and the IEP for M.M. was adopted. M.M.'s mother did not attend the meeting.

Although he did not sign the September 2004 IEP, M.M.'s father supports M.M. being at Prairie View High School. He believes M.M.'s needs are being served there. According to the father, the drive time is not a "truly deterring factor." Plaintiff stresses that M.M.'s mother is his sole guardian.

M.M.'s mother has had very little involvement with M.M.'s education at Prairie View High School. She has never sat through an entire day or even a partial day of classes with M.M. She believes she has observed him a couple of times a year in his classes. She has no personal knowledge of the number of special needs children that attend Prairie View High School.

At Prairie View High School, M.M. interacts with traditional (not special needs) students within the school.

Eliminating the Cooperative and educating the children in the individual schools presently participating in the Coop would cost the Districts an additional $839,800.00.

On August 8, 2005, the parents' attorneys filed a Due Process request, claiming that, by being forced to attend Prairie View High, M.M. had been denied public education in the least restrictive environment. The two issues before the Hearing Officer were: (a) whether the District had complied with the IDEA by providing the Student with a free and appropriate education (FAPE) in the least restrictive environment (LRE) to the maximum extent possible; and (b) whether of Paola High School or Prairie View High School was the appropriate placement for stay-put pending a final determination of the case.

9

The due process hearing was held on September 25 and 26, 2006. On March 14, 2007, the Hearing Officer issued a decision finding in relevant part that Prairie View High was the least restrictive environment for M.M. On June 5, 2007, the Reviewing Officer affirmed the Hearing Officer's Decision. This lawsuit followed.

Plaintiff's Rule 26(a)(1) Disclosures fail to identify any recoverable compensatory damages and, instead, indicate: "No computation of damages can be made; the only damages sought are compensatory damages as determined by the Court." Plaintiff later clarified and confirmed in his answers to written discovery that the compensatory damages sought were not his but those of his mother:

> 3. State the total amount of compensatory damages being sought by M.M and show the specific method by which such damages were calculated.
>
> **ANSWER:**
>
> Total amount of compensatory damages: $10,000. This figure is based on the following: Extra transportation costs incurred to drive M.M. to and from Prairie View for appointments.
> Loss of additional income because of time spent driving M.M. to and from school.
>
> Loss of income for Kathy Moore because of the necessity of cutting back her hours of work to provide transportation for M.M.

In response to the defendant's motion, the plaintiff has submitted a list of additional material facts for the court's consideration. First, he cites what is termed his "expert" witness (Dkt. No. 33, at 30), who testified at the administrative hearing that M.M. could receive some educational benefit from attending classes at Paola High School. However, the value of this witness, Ms. Leia Holly, is subject to marked limitations. Holly is a high school math teacher with no post-graduate degree. She has never seen M.M. in the classroom, and had not seen him at all for a year and a half prior to the hearing. She testified she had no knowledge of the supplemental aids and services previously supplied by the District to M.M.

The plaintiff further alleges that his placement in the ECKSEC program was based entirely on the Down Syndrome label, that the outcome was predetermined by that label, and that no

individualized assessment of his condition was made. This asserted fact is not supported by the cited evidence, the testimony of Paola High School Principal Jerry Henn. Henn testified only that Paola High School did not have a teacher qualified to teach children with evaluations similar to M.M. More importantly, Henn did not attend the meeting where M.M. was placed in the Level Program. Further, the plaintiff's characterization is directly contrary to a stipulated fact in the Pretrial Order, where plaintiff specifically agreed:

> The decision to place M.M. at Prairie View High School [wa]s based on the nature and extent of his disability, his IQ designation, his functional behavior, and his age and significance of disability, and the honest belief of the IEP Team that the best educational benefit for M.M. would be in the Level Program.

(Pretrial Order, at ¶ 4(a)(15)).

On May 14, 2008, an IEP Team met to determine the appropriate educational services for M.M. for the 2008-2009 school year. The School Psychologist, Speech Language Pathologist, School Nurse, Occupational Therapist, Principal, Level IV teacher, M.M., and his parents all attended. According to the defendant, and pursuant to this meeting, M.M.'s parents signed an IEP and agreed to the educational and related services at Prairie View High School for M.M.'s senior year. This was the first IEP agreed upon by M.M.'s parents since M.M. was in second grade. M.M.'s mother, however, contends that she did not actually agree to the IEP at the meeting – rather she merely signed the IEP as a "participant" to show that she attended the meeting.

**Conclusions of Law**

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). The Act effectively guarantees "that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 200 (1982). Under the Act, schools and other local educational agencies must adopt procedures to ensure that "[a] free appropriate public education ('FAPE') is available to all

children with disabilities residing in the State." 20 U.S.C. § 1412(a)(1)(A). FAPE is defined under 20 U.S.C. §1401(9) as

> special education and related services that: (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required....

For each child qualifying for a FAPE, the school must provide an IEP. §1414(d)(2)(A). The IEP provides a written statement of the child's present academic level, measurable annual goals for the child, a list of the necessary educational and related services the child is to receive, and a statement of the extent to which the child will participate in a regular education classroom. See §1414(d)(1)(A). The IEP is developed by a team consisting of regular and special education teachers, a representative of the school district, persons who can interpret the evaluation results, the child's parents, and (if appropriate) the child herself. §1414(d)(1)(B).

Under IDEA, a child is entitled to receive a FAPE in the "least restrictive environment." 20 U.S.C. §1412(a)(5)(A). Students are entitled to education "to the maximum extent appropriate ...with children who are not disabled" in a "regular educational environment." *Id.* This "main streaming of children with special needs is "'not only a laudable goal but is also a requirement of the Act.'" *Roark v. District of Columbia*, 460 F.Supp.2d 32, 43 (D.D.C.2006) (*quoting DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir.1989)); *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034 ("The Act requires participating States to educate handicapped children with nonhandicapped children whenever possible."). Children with special needs should be removed from the regular educational environment "only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. §1412(a)(5)(A).

In considering whether a free appropriate public education has been provided in the least restrictive environment, the court (1) determines whether education in a regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily; and (2) if not, determines if

the school district has mainstreamed the child to the maximum extent appropriate. *L.B. ex rel. J.B. v. Nebo School Dist*. 379 F.3d 966, 976 (10th Cir. 2004) (adopting the test of *Daniel R.R. v. Bd. of Educ*., 874 F.2d 1036, 1048 (5th Cir.1989)). The first prong of this test is further broken down into a consideration of several non-exclusive factors, including:

> (1) steps the school district has taken to accommodate the child in the regular classroom, including the consideration of a continuum of placement and support services; (2) comparison of the academic benefits the child will receive in the regular classroom with those she will receive in the special education classroom; (3) the child's overall educational experience in regular education, including non-academic benefits; and (4) the effect on the regular classroom of the disabled child's presence in that classroom.

*Id.*

If a parent disagrees with a placement decision under IDEA, she may seek relief though an impartial due process hearing, conducted by a qualified impartial Hearing Officer. 20 U.S.C. §1415(f). Parents disputing the Hearing Officer's findings and decision may bring a civil action in either state or federal court. 20 U.S.C. §1415(i)(2)(A). The court's role is to "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving 'due weight' to the administrative proceedings below." *Murray v. Montrose County School Dist*., 51 F.3d 921, 927 (10th Cir. 1995).

As a threshold matter here, plaintiff argues that "[s]ummary judgement is improper in an IDEA case." (Dkt. No. 33, at 41). Specifically, the plaintiff argues that under 20 U.S.C. § 1415(i)(2)(c)(i)-(iii), the court must review the administrative procedures, hear additional evidence and base its decision on a preponderance of the evidence.

The statute cited provides:

In any action brought under this paragraph, the court

> (i) shall receive the records of the administrative proceedings;
> (ii) shall hear additional evidence at the request of a party; and
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

13

The court finds that the statute does not prohibit resolution of an IDEA dispute through dispostive motion. The Tenth Circuit has upheld such pretrial resolutions of IDEA claims. *See Murray*, 51 F.3d at 921; *L.C. and K.C. v. Utah State Bd. of Educ.*, 125 Fed.Appx. 252, 2005 WL 639713 (10th Cir. March 21, 2005). Such resolution is not summary judgment, but rather a determination based on the administrative record.

In *L.C. v. Utah State Bd. of Educ.*, 125 Fed.Appx. 252, 255 (10th Cir. 2005), the court acknowledged that a district court might resolve an IDEA appeal without a trial on the merits, although such disposition was not actually by "summary judgment":

> Under the circumstances of this case, the district court's disposition is best termed "a judgment on the administrative agency's record" and not a grant of summary judgment. *L.B.* 379 F.3d at 974. When reviewing a district court's judgment on the agency record, an appellate court does not ask whether there exist genuine issues of material fact; rather, an appellate court reviews the district court's decision de novo, and applies the same IDEA standard that the court below employed. Id. We must therefore review the record ourselves and "decide independently whether the requirements of the IDEA are met," *Murray*, 51 F.3d at 927, while giving "due weight" to the hearing officer's factual findings. *L.B.*, 379 F.3d at 974.

Here, the only evidence cited by the plaintiff in his Response to the motion for summary judgment is evidence that is either already contained in the administrative record, or is reflected in pretrial admission or stipulations. (Resp. at 28-37). A dispositive judgment on the agency record is therefore appropriate.

In conducting this review, the district court does not engage in *de novo* review of the hearing officer's decision, but decides whether that decision is supported by a preponderance of the evidence. *Rowley*, 458 U.S. at 206. The hearing officer's analysis is to be given "due weight" *Id.* In addition, the factual findings from the administrative proceedings are taken as prima facie correct." *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).

Applying this standard here, the court finds that the Hearing Officer's decision is supported by a preponderance of the evidence. The Hearing Officer determined that an assignment to the Level IV Program, including the resulting placement at Prairie View High School, was appropriate under

the particular circumstances of the case. Those circumstances include M.M.'s educational development, which increasingly has left him further behind students without special needs, with a documented resulting difficulty in adjustment, which have included fidgeting and an inability to focus on classroom tasks. Those circumstances also include the agreed-to and successful placement of M.M. in the Level III program for middle school.

A key theme of the plaintiff's opposition to the defendant's motion is the contention that he has been *segregated* from other students. But the record belies this claim. M.M. attends Prairie View High School, an entirely traditional high school. There, he attends one general education class with regular education students. He can also socialize with regular education students outside of classroom time. Plaintiff's argument makes clear that the focus of his complaint is not the segregation from regular education students in general, but the commute to another high school, rather than the one closest to him.

But IDEA "does not give [the plaintiff] a right to a placement in a neighborhood school." *Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996), citing *Murray*, 51 F.3d at 928-30. In *Murray*, the court directly rejected the argument that IDEA requires both education in regular classrooms and attendance at the neighborhood school.

> This interpretation strains the plain meaning of the statute. The statute clearly addresses the removal of disabled children from classes or schools with nondisabled children. It simply says nothing, expressly or by implication, about removal of disabled children from neighborhood schools. In other words, while it clearly commands schools to include or mainstream disabled children as much as possible, it says nothing about where, within a school district, that inclusion shall take place.

51 F.3d at 928-29.

The court also rejected the plaintiffs' argument that implementing regulations (34 C.F.R. § 300.552(a)(3) and (c)) calling for placement close to the home creates an enforceable right to local placement under IDEA. The court held that these regulations created "at most a preference for education in the neighborhood school," a preference which must yield where a child's IEP justifies placement at another school. 519 F.3d at 929. The court specifically rejected the Third Circuit's

15

statement in *Oberti ex. rel. Oberti v. Board of Educ.*, 995 F.2d 1204 (3d Cir. 1993) that there should be a presumption of neighborhood schooling. *Id.*

Finally, the *Murray* court rejected an argument that statements from the legislative history of IDEA supports a presumption of local placement. That history, the court held, failed to show that Congress "meant anything more than avoiding as much as possible the segregation of disabled children from nondisabled children," and not that the least restrictive environment under IDEA "is always or even usually in the neighborhood school." *Id.* Ultimately, the court concluded that the mandate for an education in the least restrictive environment

> does not include a presumption of neighborhood schooling, and a school district accordingly is not obligated to fully explore supplementary aids and services before removing a child from a neighborhood school. It is only so obligated before removing a child from a regular classroom with nondisabled children.

Id. at 930.

Lengthy bus rides are a burdensome fact of life for many students in rural or thinly populated areas of Kansas. Given the evidence otherwise showing the benefits to M.M. of placement in the Level Program, including his successful attendance in the Program in middle school, the court finds that placement in the Level Program did not violate the requirements of IDEA. Placement in the Level IV reflects a continuum of placement and support services from the earlier Level III middle school placement. The evidence shows that M.M. had increasing difficulty in attending regular education classes, and will receive benefit from attendance in the Level IV program.

Accordingly, the court will grant defendant's motion for a dispositive resolution on the plaintiff's IDEA claims.

The defendant raises a series of additional arguments in its motion. First, it argues that the present action is precluded by the failure of the plaintiff to exhaust its administrative remedies by means of state court review pursuant to K.S.A. 77-6101. Citing *Padilla ex rel. Padilla Schoolt Dist. No. 1*, 233 F.3d 1268 (10th Cir. 2000), it also argues that plaintiff's claims under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act are precluded by the failure to exhaust administrative remedies, since these claims are purely derivative of his claims under IDEA.

In *Padilla*, the court held that exhaustion of administrative remedies may be required for non-IDEA claims which "allege[] injuries that could be redressed to any degree by the IDEA's administrative remedies and procedures." 233 F.3d at 1274. See 20 U.S.C. §1415(l) (specifically providing that ADA and Rehabilitation Act claims exhaust remedies under §1415(f) and (g)). *See also Eads ex rel. Eads v. Unified School District No. 289*, 184 F.Supp.2d 1122 (D. Kan. 2002). In response to the exhaustion argument, plaintiff states, without citation to any authority, that "[n]either the Rehabilitation Act nor Title II of the ADA has an exhaustion requirement, and therefore, those spearate and factually distinct claims may be brought in this action." (Resp., at 55).

The court finds that the district's exhaustion remedy is without merit. The ADA and the Rehabilitation Act do have exhaustion requirements, as reflected in 20 U.S.C. §1415(l), but M.M. has satisfied those requirements here. K.S.A. 77-6101 may provide an additional means of state court review for some administrative decisions in Kansas, but it falls outside the scope of the IDEA system of review. Under §1415(f), a complaint is first heard by either "the State educational agency or by the local educational agency." Pursuant to §1415(g), aggrieved parties may appeal to "the State educational agency," which then renders a decision. Further state procedures for subsequent state court review are irrelevant for federal purposes, since §1415(i)(1) explicitly provides that the decision of the educational agency under subsection (f) or (g) is "final," and, under §1415(i)(2)(A), that any party aggrieved by such a final decision "shall have the right to bring a civil action." Accordingly, the court finds that M.M. exhausted his administrative remedies under IDEA, and the present action is properly brought.

However, the court agrees that the Rehabilitation Act and ADA claims should be dismissed. The district correctly notes that courts have determined that derivative ADA and Rehabilitation Act claims may be dismissed where the underlying IDEA claim is denied on the merits. *See Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 562 (10th Cir. 1996); *Moubry v. Independent Sch. Dist. 696*, 6 F.Supp.2d 1086, 1108-09 (D. Minn. 1998). In his response, M.M. merely recites the generic requirements for claims under these statutes (Resp. at 53-54), but makes no attempt to explain why

17

these claims should survive if his IDEA claim is determined to be without merit. According, having reached such a finding as to the IDEA claim, the court will also grant summary judgment as to the remaining claims under the ADA and the Rehabilitation Act.

The district presents several more arguments which the court need not address. Specifically, it argues that the damages claimed by plaintiff cannot be recovered, since they belong to the mother rather than to the plaintiff himself, and that the present action is moot in light of a putative agreement to on May 14, 2008 to place M.M. in the Level IV program. It is in connection with the last argument that the district has separately moved to amend the Pretrial Order to advance the accord supposedly represented in the May 14 agreement. In light of the court's other findings, it need not resolve either issue.

IT IS ACCORDINGLY ORDERED this 18th day of November, 2008 that the defendant's Motion for Summary Judgment (Dkt. No. 22) is hereby granted as provided herein; defendant's motion to amend the Pretrial Order (Dkt. No. 24) is denied as moot.

s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE